## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO. 20-10032** |
| **XS RANCH FUND VI, L.P.** | § | |
| | § | |
| **DEBTOR.** | § | **CHAPTER 11** |

**DEBTOR'S MOTION SEEKING ENTRY OF INTERIM AND FINAL
ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364 AND 507
(I) APPROVING POSTPETITION FINANCING,
(II) GRANTING PRIMING LIENS AND PROVIDING SUPERPRIORITY
ADMINISTRATIVE EXPENSE STATUS, (III) MODIFYING AUTOMATIC STAY, (IV)
GRANTING ADEQUATE PROTECTION, (V) GRANTING RELATED RELIEF, AND
(VI) SCHEDULING A FINAL HEARING**

**THIS MOTION SEEKS ENTRY OF AN ORDER THAT MAY
ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU
SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO
RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY
CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY
TO THE MOVING PARTY. YOUR RESPONSE MUST STATE WHY
THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A
TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT
FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND
HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE
HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE
COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY
DECIDE THE MOTION AT THE HEARING.**

**EMERGENCY RELIEF HAS BEEN REQUESTED. IF THE COURT CONSIDERS
THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN
21 DAYS TO ANSWER. IF YOU OBJECT TO THE REQUESTED RELIEF OR IF
YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT
WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE.**

The above-captioned debtor and debtor in possession (the "Debtor") hereby respectfully

moves (the "Motion") the Court pursuant to 11 U.S.C. §§ 105, 363, 364, 503, 507, Rules 2002,

4001(c), 9006 and 9014 of the Federal Rules of Bankruptcy Procedure for an Order,

substantially in the form attached hereto as **Exhibit A**:

1.     Authorizing the Debtor to borrow (i) the sum of $750,000 on an interim basis (the "Interim Loan") and (ii) up to an additional $5.25 million on a final basis (together with the Interim Loan, the "DIP Loan") pursuant to the terms of the Secured Super-Priority Post-Petition Credit Agreement (the "DIP Credit Agreement") attached to the Motion as **Exhibit B**;

2.     Authorizing the Debtor to execute and enter into the DIP Credit Agreement and to perform such other and further acts as may be required thereby;

3.     Authorizing the Debtor to use the proceeds of the DIP Loan in accordance with the budget (the "Budget") attached hereto as **Exhibit C** and set forth in Schedule 1.3 of the DIP Credit Agreement, as such may be revised with the Lender's written consent;

4.     Finding pursuant to section 361(3) of the title 11 of the United States code (the "Bankruptcy Code") that the Prepetition Secured Lenders (as defined herein) are adequately protected by and will realize the indubitable equivalent of their security interests as a result of: (i) a  substantial equity cushion in excess of 20% and (ii) post-petition payments of interest that are accruing by capitalization pursuant to the Crestline Loan Agreement and the Steiner Notes (the "Adequate Protection Payments") and authorizing and directing the Debtor to make the Adequate Protection Payments, as more specifically set forth herein;

5.     Granting a super-priority claim pursuant to section 364(c)(1) and a priming lien pursuant to section 364(d) of title 11 of the United States Code (the "Bankruptcy Code") on all of the Debtor's property, both real and personal; and

6.     Finding that the DIP Loan is made in good faith.

The Debtor further requests that the Court (i) schedule a final hearing on the Debtor's request to borrow funds; (ii) approve notice procedures with respect thereto and (iii) grant such other and further relief as the Court deems appropriate.

This Motion is based upon the authorities and arguments set forth below and the *Declaration of Chris Wu in Support of Debtor's Motion Seeking Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 (i) Approving Postpetition Financing, (ii) Granting Priming Liens and Providing Superpriority Administrative Expense Status, (iii) Modifying Automatic Stay, (iv) Granting Adequate Protection, (v) Granting Related Relief, and (vi) Scheduling a Final Hearing* (the "<u>Wu Declaration</u>"), the *Declaration of Lance Dore in Support of Debtor's Motion Seeking Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 (i) Approving Postpetition Financing, (ii) Granting Priming Liens and Providing Superpriority Administrative Expense Status, (iii) Modifying Automatic Stay, (iv) Granting Adequate Protection, (v) Granting Related Relief, and (vi) Scheduling a Final Hearing* (the "<u>Dore Declaration</u>") and the Request for Judicial Notice, filed herewith.

[*This Motion continues on the next page.*]

In accordance with Rule 4001(c) of the Federal Rules of Bankruptcy Procedure, the following are material provisions of the DIP Credit Agreement.

| Term | Description | Agr. § | Ord. ¶ |
|---|---|---|---|
| DIP Lender | Serene Investment Management LLC or its affiliates | Preamble | |
| Borrowing Amount | $6 million (the "Commitment") of which $750,000 is sought on an interim basis; DIP Loan can be drawn thereafter in $500,000 minimum increments | § 1.1(i)(a) | |
| Interest Rate | 9.5% per annum, no compounding; no interest accrues on amounts not drawn on the revolving line of credit | § 1.4(i) | |
| Fees | Commitment Fee: 3% of the Commitment or $180,000<br><br>Funding Fee: .5% of the amount drawn by Debtor, estimated $30,000<br><br>Exit Fee: 2% of amount of the Commitment, estimated $120,000<br><br>Total Fees: $330,000 estimated | § 9.3 | |
| Default Interest Rate | 16% per annum, no compounding | § 1.4(iv) | |
| Maturity Date | The earliest of (i) 12 months, (ii) the closing of a sale of all or substantially all the Estate's assets, (iii) confirmation and consummation of plan or (iv) an Event of Default in DIP Lender's discretion. Extension of Maturity Date for another 12 months at Debtor's request and assuming no breach and representations/warranties remain accurate and true. | § 6.1<br>§ 7.1(ix)<br>§ 7.2(ii) | |
| Events of Default | Failure to make any payment of principal of, or interest on, or fees owing in respect of the Loan | § 7.1(i) | |
| | Use of Loan Proceeds outside of uses identified in the Budget | § 7.1(ii) | |

| Term | Description | Agr. § | Ord. ¶ |
|------|-------------|--------|--------|
|  | Breach of negative covenant regarding indebtedness, liens, use and hazardous materials on the Debtor's real property | § 7.1(ii) § 5.3 |  |
|  | Allowance of a claim or lien that is *pari passu* or superior to the DIP Lien. | § 7.1(ii) § 5.4 § 7.1(viii) |  |
|  | Any untrue representation or warranty | § 7.1((iii) |  |
|  | The DIP Lender ceases to have super-priority pursuant to 11 U.S.C. §§ 364(c)(1) and 365(d) | § 7.1(iv) |  |
|  | Debtor's non-observance of covenants that are not remedied during 30-day (or, if applicable 90-day) cure period. | § 7.1(v) |  |
|  | Appointment of trustee or examiner | § 7.1(vii) |  |
|  | Debtor's violation of Interim Financing Order or Final Financing Order, including, use of loan for items outside of the Budget | § 7.1(vii) |  |
|  | Entry of an Order converting or dismissing this bankruptcy case | § 7.1(viii) |  |
|  | Granting of lien or allowance of claim that has a priority higher than the DIP Lender's lien and claim | § 7.1(ix) |  |
|  | Debtor files a plan that does not provide for payment of the DIP Loan or otherwise incorporate terms of the DIP Credit Agreement | § 7.1(x) |  |
|  | Interim Financing Order or Final Financing Order Orders are amended, stayed, vacated, or modified without DIP Lender's written consent | § 7.1(xi) |  |
|  | Debtor challenge to DIP Lender's claim | § 7.1(xii) |  |
|  | Grant of relief from stay to any other holder of a lien in the collateral that secures the DIP Loan | § 7.1(xiii) |  |

| Term | Description | Agr. § | Ord. ¶ |
|---|---|---|---|
| Use of Loan Proceeds | Loan proceeds used as set forth in the Budget, Schedule 1.3 (**Exh. C** hereto) | § 1.3 | ¶ 4 |
| Borrowing Conditions | Execution of DIP Credit Agreement Entry of Financing Orders | § 2.1.1<br>§ 2.1.2 | n/a |
| Granting of Priority | Secured super priority with a lien on all of the Debtor's assets, both real and personal | § 3.4 | ¶¶ 5-6 |
| Payment Terms | Principal and interest due in 12 months; provided that condemnation proceeds or cash proceeds of any asset disposition must be applied to DIP Loan | § 1.2(ii)<br>§ 2.4 | n/a |
| Indemnification | Debtor indemnifies the DIP Lender from claims arising from the DIP Loan except those arising from gross negligence of willful misconduct | § 1.6 | ¶ 18 |
| Waiver/Modification of Automatic Stay, 11 U.S.C. § 362 | Relief from stay on 21 days' notice after the occurrence of an Event of Default | n/a | ¶ 13 |
| Waiver/Modification of Nonbankruptcy Law re Lien Perfection | DIP Liens perfected by this Court's Orders | § 3.8(i) | ¶ 6 |
| Limitation of Rights under 11 U.S.C. § 506(c) | No surcharge against Lender, Carve-Out or Collateral without written consent of Lender and Carve-Out beneficiaries, as applicable | n/a | ¶ 19 |

## I.     PRELIMINARY STATEMENT

1.     The Debtor is a master-planned community strategically located in Bastrop, Texas, 20 minutes east of the Austin-Bergstrom International Airport, between Austin and Houston. It is believed to be the largest assemblage of land available for development in the greater Austin area in the last fifty years. The subject property represents a highly unique tract of land which is 8,742 acres in size. There are few (if any) comparable tracts of land which sell

within a reasonable distance to a major Metropolitan Statistical Area that are of this size. With unique, rolling topography, the property boasts views of downtown Austin, over nine miles of year-round streams, more than 70 lakes and ponds, and almost three miles of Lower Colorado River frontage. The property is suited for residential development and fully entitled for 10,000 single family lots and 500,000 square feet of commercial space. Other entitlements include: a recorded, 45-year Development Agreement, an Army Corps of Engineers individual 404 Permit, an authorized XS Ranch Municipal Utility District and a prepared Public Improvement District.

2.      As set forth below and in the Dore Declaration, the Debtor has more than $20 million in equity in its real property alone. The Debtor also owns significant water rights via its wholly-owned subsidiary, XS Water Company, LLC.

3.      This case is filed on an emergency basis to avert a foreclosure on the foregoing real property that is scheduled for January 7, 2020 in Bastrop, Texas. To file this case, the Debtor had to overcome an array of hurdles set before it by self-interested professionals who by their unscrupulous and unethical actions and inactions failed to fulfill their fiduciary duties and as a result, failed the Debtor. As set forth more fully below, the Debtor is a post-confirmation reorganized debtor in a case pending in Oakland, California. The Debtor's former Plan Agent in that case refused for weeks to turn over the Debtor's books and records, despite his clear fiduciary obligation to do so. Only after receiving a formal demand on December 30, 2019, did the former Plan Agent *begin* to cooperate.

4.      Furthermore, the foreclosure is based on the technical breach of a nonmonetary provision that violated the Confirmation Order in the California bankruptcy case. The Debtor obtained a Temporary Restraining Order form the Bastrop County District Court on December

2, 2019 to restrain the foreclosure. After the Debtor nonsuited the case without prejudice, Crestline immediately noticed a foreclosure sale for January 7, 2020.

## II.    JURISDICTION AND VENUE

5.      The United States Bankruptcy Court for the Western District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the United States District Court for the Western District of Texas's *Order of Reference of Bankruptcy Cases and Proceedings* dated October 4, 2013.  The Debtor confirms its consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 9013 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Western District of Texas (the "Local Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

6.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

7.      The bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, and 9014.

## III.    BACKGROUND OF THE DEBTOR

8.      The Debtor is a limited partnership organized under the laws of Delaware. Its General Partner is XS Ranch VI Manager, L.P., a Delaware limited partnership. The General Partner of XS Ranch VI Manager, L.P. is Coast Range Investments LLC, a California limited liability company. Based upon information and belief, James P. Foster owns 88% of the membership interests of Coast Range Investments, LLC and John Landwehr owns the remaining 11% of the membership interests of Coast Range Investments, LLC.

9.      The Debtor also has a wholly-owned subsidiary, XS Water Company LLC ("XS Water"), which is a Texas limited liability company. XS Water owns significant water rights which. pursuant to that certain *Groundwater Rights Purchase Agreement* between XS Water Company, LLC, a Texas Limited Liability Company, as Seller, and the City of Bastrop, a Texas Home Rule City, as Buyer, dated May 14, 2014, as subsequently amended, XS Water sold 3,000 acre feet per year of water rights to the City of Bastrop for a price of $2 million with an option for the City of Bastrop to purchase an additional 3,000 acre feet per year of water rights for $1 million payable in five annual installments of $200,000. In January 2019, the City of Bastrop exercised this option and paid to the Debtor $200,000 in January 2019. The Debtor expects to receive an additional $200,000 payment (the "January Water Payment") from the City of Bastrop in January 2020. The balance owed is $600,000. The Debtor intends to segregate the January Water Payment, once received, pending further review and discussion among the parties in interest.

10.     The Debtor is filing this case to avoid a foreclosure sale set for January 7, 2020 that is based on the technical breach of a non-monetary loan agreement provision that was both cured and void *ab initio*. This is the second time in three years that the Debtor has had to fight to defend its rights against an over-reaching secured creditor who engineered these improper actions for its sole benefit at the expense of other stakeholders. As set forth more fully below, even after accounting for the exorbitant loan terms given to Crestline, and accounting for the Debtor's other secured debt, including the proposed DIP Loan in this case, Debtor's Prepetition Secured Creditors (defined below) have an equity cushion of more than twenty percent (20%). Equity totals approximately $20 million.

A.      **The California Bankruptcy Case**

11.     On December 23, 2016, a set of limited partners who held a stipulated judgment in the amount of $28.6 million based on the consensual rescission of their capital contributions (the "Rescission Claims"), commenced an involuntary petition for relief against the Debtor and thus commenced the California Bankruptcy Case. The petition sought relief under chapter 7 of the Bankruptcy Code. The Debtor converted the case to one under chapter 11 and obtained an Order subordinating the Rescission Claims to below equity pursuant to section 510(b) of the Bankruptcy Code. This cleared the way to confirmation of a Plan that paid all allowed general unsecured claims in full, with one exception relating to the insider claims of James P. Foster and Coast Range Investments LLC. Thereafter, based on the record, the California Bankruptcy Case went awry.

12.     Pursuant to the *Debtor's Second Amended Chapter 11 Plan of Reorganization as Modified*, filed in the California Bankruptcy Case on March 23, 2018 [ECF 437] (the "Plan"), a true and correct copy of which is attached as Exhibit A to the Request for Judicial Notice that is filed herewith in support of the DIP Motion, the Debtor was to borrow exit financing (originally in the amount of $30 million and later increased to $35 million). The exit financing closed pursuant to that certain *Credit, Security and Guaranty Agreement*, dated May 10, 2018 as amended pursuant to that First Amendment to Credit Security and Guaranty Agreement, dated June 19, 2019 (the "Exit Financing Agreement") between Debtor, on the one hand, and Crestline and its affiliates (collectively, "Crestline"), on the other. A true and correct copy of the Exit Financing Agreement is attached to the Wu Declaration as Exhibit A.

13.     Pursuant to the Plan and the exit financing provided by the Plan, the Debtor had

until February 10, 2019[1] to raise $10 million in capital. If it met this deadline, then the

obligation to repay the amounts owing under the Exit Financing Agreement would not mature

until May 2021. However, if the Debtor did not raise the $10 million by February 10, 2019, then

the Debtor was to hire brokers and market the property. It would have one year to sell the

property. None of these provisions were followed.

14.     Rather than initiate, as the Plan required, a marketing process to tap the capital

markets, which was the main task assigned to the Debtor's chief restructuring officer and

subsequent plan agent, Michael VanderLey (the "Plan Agent"), the Plan Agent and Debtor's

former counsel engaged in other activities, notably (a) taking credit for having sourced Crestline

and (b) improperly blocking the effort of the party that had actually introduced Crestline to the

Debtor, Melting Point Solutions, Inc. ("Melting Point"), from recovering its finder's fee. After

an evidentiary hearing, the Court found that, "VanderLey was not a persuasive witness. His

testimony seemed calculated, self-interested, conveniently vague, and at times, intentionally

evasive." The Court added, "Chillingly, despite the fact that he is a fiduciary here, VanderLey

suggested to Haas [of Melting Point] that seeking to be paid might expose Haas to criminal

liability because he lacked a California real estate license." A true and correct copy of the

California Bankruptcy Court's memorandum opinion on this matter is attached to the Request

for Judicial Notice as Exhibit B. The Court then ruled in Melting Point's favor.

---

[1] The Plan does not state the date by which the $10 million capital raise had to be completed.
However, the Exit Financing Agreement, attached hereto as Exhibit A, at p. 25, states that the
"Specified Equity Raise Threshold Date" was February 10, 2019.

15.     The Plan Agent readily admits that he made no effort to raise capital. His stated excuse is that the Debtor's indirect principal, James Foster, "tied his hands." However, the Plan Agent could at any time have moved the California Bankruptcy Court for an Order pursuant to section 1142 of the Bankruptcy Code directing the Plan Agent to conduct a robust capital raise process, regardless of whether or not Foster "wanted" that process. And the notion that Foster would not consider offers of capital strains credibility.

16.     In February 2019, with the capital raise deadline looming, Foster reached out directly to Crestline for an extension or forbearance of the capital raise deadline. While Crestline copied its own counsel on emails during these discussions, it never copied the Debtor's lawyers. More troubling, the Plan Agent, who was copied on these emails, never contacted the Debtor's lawyers or the Court. Crestline's attorneys violated Rule 4.2 of the California Rules of Professional Conduct which prohibits an attorney from communicating directly or indirectly with a represented party without the party's counsel present.  This rule applies even if the represented party initiates the contact. As a result of this conduct, the Debtor was unrepresented in the forbearance negotiations with Crestline and its counsel, which led to the Debtor transferring to Crestline $875,000 for a mere 45-day extension of the deadline to raise $10 million in capital.

17.     Furthermore, pursuant to paragraph 9 of the *Order Confirming Debtor's Second Amended Chapter 11 Plan of Reorganization, as Modified,* dated March 25, 2018 [ECF 442] (the "Confirmation Order"), a true and correct copy of which is attached to the Request for Judicial Notice as Exhibit C, the DIP Financing Agreement could be amended, but only on terms that were "not less favorable" than the terms set forth in the Commitment Letter that was attached to the Plan.

18.     Despite this clear prohibition, Crestline with the Plan Agent's support inserted into an amendment to their loan agreement a trip wire provision that was clearly "less favorable" than was set forth in the Commitment Letter attached to the Plan and that has brought the Debtor to this Court today. The trip wire provision is set forth in section 9.1(n) of the Exit Financing Agreement, which is attached to the Wu Declaration as <u>Exhibit A</u>. It provides that the Debtor could not fire the Plan Agent without the appointment of a new Plan Agent satisfactory to Crestline, in its sole discretion. The Plan Agent negotiated this amendment to the Crestline loan without discussing this provision with James Foster. He also omitted the Debtor's bankruptcy counsel from any discussions regarding it until after the amendment's closing.

19.     On June 20, 2019, the day after Foster signed the amendment to the Exit Financing Agreement, Foster exercised his authority under the Plan and fired both the Plan Agent and the bankruptcy counsel. He also asked them to assist with an orderly transition to a new professional team.

20.     Rather than effect that orderly transition, the Plan Agent and now former bankruptcy counsel immediately filed a motion with the Court (June 21, 2019) that blamed Foster for having paid Crestline $875,000 to extend the capital raise deadline, without also disclosing to the Court that the Plan Agent allowed Crestline and its attorneys to negotiate directly with Foster. The Plan Agent also asked the Court to transfer all power over the Debtor to him. A true and correct copy of this *Motion for Order Vesting Michael VanderLey with Sole and Exclusive Control over the Debtor, Including Authority to Enter Into and Close on a Sale of the Debtor's Assets in Order to Consummate the Debtor's Second Amended Chapter 11 Plan of Reorganization, as Modified, and Related Brief*, filed in the California Bankruptcy Case on June

21, 2019 [ECF 580] (the "VanderLey Vesting Motion") is attached to the Request for Judicial

Notice as Exhibit D. A true and correct copy of the Plan Agent's declaration in support of the

VanderLey Vesting Motion is attached to the Request for Judicial Notice as Exhibit E. The

California Bankruptcy Court dismissed the VanderLey Vesting Motion without prejudice.

21.     The conduct of Debtor's former counsel, Garrick Hollander of Winthrop

Couchot, is also troubling. After the Debtor fired Hollander, he switched sides in the same case.

In the VanderLey Vesting Motion, Hollander took positions materially adverse to his former

client, the Debtor, by seeking to strip the Debtor of power over its own affairs and transferring

those powers to the Plan Agent. The Debtor did not consent to former counsel representing the

Plan Agent against the Debtor in the California Bankruptcy Case.

22.     This conduct violated Rule 1.9 of the California Rules of Professional Conduct,

which prohibits a lawyer from becoming adverse to a former client in the same or similar matter

without informed written consent of the client:

> (a) A lawyer who has formerly represented a client in a matter
> shall not thereafter represent another person in the same or a
> substantially related matter in which *that person's interests are
> materially adverse to the interests of the former client* unless the
> former client gives informed written consent.

Rule 1.9 Duties to Former Clients (Rule Approved by the Supreme Court, Effective November

1, 2018).

23.     As the Plan Agent was busy trying to gain control of the Debtor, Crestline

declared an event of default for breach of the unauthorized trip wire provision and swept all but

a few thousand dollars from the Debtor's accounts. This left the Debtor financially crippled.

24.     After the Court dismissed the VanderLey Vesting Motion, the Plan Agent took

the position that at this late date (even though it was only late June 2019), it would be hard to

sell the property by the deadline set forth in the Plan, February 2020, and therefore the Debtor

had no choice but to accept an offer from PV Development Management LLC ("Pacific Ventures") despite the lack of a marketing process. Pacific Ventures, who served as the Debtor's property manager, decided to become the purchaser of the property taking advantage of its unique knowledge and position as property manager. Pacific Ventures asked for a 90-day exclusivity period even though the Plan Agent was aware that the Debtor was against granting Pacific Venture any exclusivity.

25.     At this point with limited avenues with Crestline and in an attempt to appease Crestline and the Plan Agent, the Debtor reinstated the Plan Agent and sought and obtained a Court order that properly provided on notice and hearing that any further attempt to fire the Plan Agent would have to be agreed to by Crestline, Debtor's new insolvency counsel, and the Court. The Debtor also conceded the broad scope of authority granted to the Plan Agent under the Plan. A true and correct copy of the *Stipulation to Execute Documents and Take Acts Necessary to Consummate Plan Pursuant to 11 U.S.C. § 1142*, dated July 24, 2019 [ECF 590] and *Order Approving Stipulation to Execute Documents Necessary to Consummate Plan Pursuant to 11 U.S.C. §1142*, dated August 29, 2019 [ECF 601] is attached to the Request for Judicial Notice as Exhibit F.

26.     The Debtor's last ditch efforts at appeasement failed. Crestline refused to withdraw the declaration of default and commenced foreclosure proceedings. However, because the Pacific Ventures sale was on the table, Crestline also extended the foreclosure sale and provided protective advances to facilitate the sale, again without a marketing process. On November 7, 2019, Pacific Ventures exercised its right to withdraw from the sale agreement.

27.     Because the property was never properly exposed to the market in a broad sale process, when the Pacific Ventures transaction failed to be consummated, the Debtor was left

with no other options. The Plan Agent had neither raised capital nor run a traditional auction process for the assets. By omission, the Plan Agent effectively deprived the Debtor of any further value-maximizing initiatives or options even before the February 2020 deadline to sell. Given the Debtor's crippled state and without funds, negotiations with Crestline failed. Crestline announced on the day before Thanksgiving, November 27, 2019, that it would proceed with the foreclosure that was noticed for December 3, 2019.

28.     The same day that negotiations with Crestline ended, Winthrop Couchot *again* took sides against its former client in the California Bankruptcy Case and filed a motion to convert the case to one under chapter 7 of the Bankruptcy Code on expedited consideration. A true and correct copy of the request for expedited consideration and the *Notice of Motion and Motion Under 11 U.S.C. § 1112(b) to Convert Case to Chapter 7; Memorandum of Points and Authorities in Support Thereof* ("Motion to Convert") is attached to the Request for Judicial Notice as Exhibit G. In concert, the Plan Agent filed a declaration in support of this motion. A true and correct copy of the Plan Agent's declaration in support of the Motion to Convert is attached to the Request for Judicial Notice as Exhibit H. Winthrop Couchot and the Debtor's Plan Agent filed this motion without conferring with Foster or Debtor's bankruptcy counsel.

29.     The California Bankruptcy Court refused Winthrop Couchot's request for expedited consideration, essentially stating that it was not going to drop everything over the holidays to hear from this group again. A true and correct copy of the Order denying Winthrop's request is attached to the Request for Judicial Notice as Exhibit I. In *dictum*, and without the benefit of the context and facts set forth here, the Court added that Crestline was enforcing its rights under the Plan. On or about Friday, November 29, 2019, at the Debtor's insistence, the Plan Agent withdrew his declaration in support of the Motion to Convert.

**B.     The Temporary Restraining Order**

30.     On December 2, 2019, the Debtor filed *Plaintiff's Original Petition, Application for Temporary Restraining Order, and Request for Temporary Injunction* (the "TRO Petition") in the District Court of Bastrop County, Texas and obtained a *Temporary Restraining Order & Order Setting Hearing for Temporary Injunction* (the "TRO"). A true and correct copy of the TRO Petition and the TRO are attached to the Request for Judicial Notice as Exhibit J.

31.     Crestline responded with a blistering set of threats, including a threat to counterclaim for fraud if the case were not dismissed by December 9, 2019. On December 6, 2019, the Debtor dismissed the TRO lawsuit without prejudice. The Debtor is trying to preserve the extraordinary value of the Debtor's property for all stakeholders and cannot afford at this time to engage in costly litigation with Crestline regarding the trip wire provision and its other inappropriate actions. Nonetheless, the Debtor reserves all rights with respect to Crestline's misconduct.

32.     Initially, the Debtor considered going back to the California Bankruptcy Case in order to obtain an order declaring that the trip wire provision in the Exit Financing Agreement restricting the Debtor's ability to fire the Plan Agent was void. It stated this intent in its TRO motion. However, after gaining the brief respite of the TRO, the scope and extent of the misconduct by Crestline, the Plan Agent and its former counsel caused the Debtor to realize that the slate needs to be cleaned and a new case filed. No transfer of property occurred under the Plan and the Debtor never regained control of its management. In fact, as the Stipulation shows, the Debtor ceded control to the Plan Agent as time went on.

C.      **Filing a New Chapter 11 Case**

33.     The Debtor decided to file a new chapter 11 case in Texas where the Debtor's property is located, rather than in California where the holders of the Rescission Claims chose to commence the involuntary petition. The Debtor also retained a new Chief Restructuring Officer, subject to this Court's approval, in order to assess, develop and execute the Debtor's strategy of maximizing the extraordinary value that the Property offers. In further demonstrating the value of the Debtor's assets, certain of the Debtor's limited partners have funded the professional retainers of the Debtor pre-petition through a capital contribution.

34.     On December 23, 2019, exactly three years to the day that the California Bankruptcy Case was commenced as an involuntary chapter 7 case, the Plan Agent resigned. Both before and after his resignation, the Plan Agent obstructed the Debtor's efforts to prepare for this case, refusing to turn over the Debtor's books and records while he sought clarity on whether he would be paid. In fact, the Plan Agent did not begin to cooperate until one week before the filing of this case and then only after the Debtor had sent a formal demand that specified his turnover obligations as a fiduciary.

35.     Last week, the Debtor informed all of the Debtor's secured creditors of its intent to commence this case and obtain authority to enter into the DIP Loan. The Debtor invited discussion regarding this plan as well as proposals for post-petition financing.

IV.     **DEBTOR'S PRE-PETITION INDEBTEDNESS**

36.     Unsecured creditors are owed less than $2 million. A significant portion of the general unsecured claim pool is comprised of the Debtor's professionals.

37.     The Debtor has three pre-petition secured creditors: Crestline Direct Finance, L.P. and its affiliates ("Crestline"); Steiner & Sons, Ltd. ("Steiner") and Melting Point.

### A.   The Crestline Indebtedness

38.   Pursuant to the Exit Financing Agreement, attached to the Wu Declaration as
Exhibit A, Crestline asserts the right to payment on a secured basis in the principal amount of
$35 million. Nondefault interest accrues at the annual rate of 16%. Default rate of interest
accrues at 20% per year.

39.   The Debtor's obligations under the Exit Financing Agreement total
approximately $40 million. Crestline asserts that these obligations are secured by a first priority
lien on approximately half of the Debtor's 8,742 acres of land, a second priority lien on the
other half of the Debtor's land, and a first priority lien on all of the Debtor's personal property
including its membership interests in a subsidiary, XS Water, which as set forth above owns
significant water rights. Crestline may assert that XS Water is a guarantor of the Debtor's
obligations to Crestline under the Exit Financing Agreement.

40.   Crestline also holds certain Warrants pursuant to which it asserts the right to
acquire equity interests in the Debtor pursuant to their terms.

41.   The Maturity Date of the Exit Financing Agreement is May 2021.

### B.   The Steiner Indebtedness

42.   Steiner asserts the right to payment on a secured basis in the amount of $11.5
million in principal pursuant to two notes: that certain Promissory Note, dated December 19,
2006 in the principal amount of $10 million, and that certain Promissory Note, dated September
6, 2013 in the principal amount of $1.5 million (collectively, the "Steiner Notes"). Steiner
asserts a first position secured lien on the Steiner Secured Parcel (which is approximately half of
the Debtor's land). A true and correct copy of the Steiner Notes is attached to the Wu
Declaration as Exhibit B.

43.     Pursuant to the Plan,  the Maturity Date for the Steiner Notes was extended from June 19, 2023 to June 19, 2024. (Request for Judicial Notice, Exh. A, Plan, ¶ 8.2)  Further pursuant to the Plan, the Debtor pays interest on a quarterly basis in the amount of $258,750. (*Id.*)

44.     When Crestline swept the Debtor's accounts, it rendered the Debtor unable to pay the quarterly interest payments that were due in September and December of 2019. The Debtor is informed that Crestline paid these quarterly interest payments to Steiner in exchange for certain promises. The Debtor has not yet obtained a copy of this inter-creditor agreement, despite request.

### C.     The Melting Point Indebtedness

45.     After the evidentiary hearing regarding Melting Point's claim, the Court ruled that the Debtor owed Melting Point $610,134.54 on a general unsecured basis, comprised of more than $200,000 in attorney's fees incurred by Melting Point in asserting its claim. The Debtor paid Melting Point $300,000 and then signed that certain Secured Note, noted June 17, 2019 (the "Melting Point Note"), pursuant to which the Debtor agreed to pay Melting Point an additional $310,234.54 with an annual interest rate at 8%  promissory note and to grant to Melting Point a third position security interest in the Debtor's real estate and a second position lien on most of the Debtor's personal property. The maturity date of the Melting Point Note is February 28, 2020. The estimated amount now due under the Melting Point Note is $324,230. A true and correct copy of the Melting Point Note is attached to the Wu Declaration as **Exhibit C**.

46.     Crestline has entered into an intercreditor agreement with Melting Point pursuant to which Melting Point agreed that its claim would be subordinate to that of Crestline.

## V.    THE PROPOSED LOAN

### A.    Loan Overview

47.    The Debtor seeks to enter into the DIP Credit Agreement as an administrative expense, having priority over other administrative expenses, pursuant to section 364(c)(1), and further seeks permission to grant to the DIP Lender a lien pursuant to section 364(d) that is senior to the liens and security interests held by the Debtor's three pre-petition secured lenders. A true and correct copy of the DIP Credit Agreement is attached hereto as **Exhibit B**.

48.    The DIP Loan is favorable to the Debtor. The interest rate is 9.5% annual with no compounding. The DIP Loan makes $6 million available to the Debtor with no interest accruing on amounts that are not drawn. Amounts are to be withdrawn in $500,000 increments, provided that the first withdrawal may be in the amount of $750,000. The DIP Loan imposes no case controls. It is due in 12 months with an option to extend, at no cost, for another 12 months. DIP Lender fees are estimated at $330,000.

### B.    Use and Repayment

49.    The DIP Loan intends to give the Debtor the breathing room that was denied it in the California Bankruptcy Case. The Debtor will use the DIP Loan proceeds to (i) pay for the expense of managing and marketing the Debtor's assets; (ii) provide Crestline and Steiner the indubitable equivalent of their security interests in the Debtor's assets by paying interest payments as they come due, while also preserving their significant 20% or greater equity cushion, and (iii) pay for the administration of the case. More specifically, the Debtor will use the DIP Loan as set forth in the DIP Budget, Schedule 1.3 to the DIP Credit Agreement. A true and correct copy of the DIP Budget is attached hereto as **Exhibit C**.

**C.      The Debtor Requests That the DIP Loan Be Approved on a Super-Priority Administrative Basis**

50.      Under section 364(c), the court may authorize the Trustee to obtain credit or incur post-petition debt entitled to a "super-priority" claim over all administrative expense claims specified in § 503(b) (administrative expenses) or § 507(b) (other super-priority administrative claims for failed adequate protection). 11 U.S.C. § 364(c)(1). *See also Bland v. Farmworker Creditors,* 308 B.R. 109, 114 (S.D. Ga. 2003) ("§364 provides incentives to induce lenders to undertake risks of post-petition financing"). *See also In re Fleetwood Enterprises, Inc.*, 427 B.R. 852 (Bankr. C.D. Cal. 2010) *aff'd,* 471 B.R. 319 (B.A.P. 9th Cir. 2012):

> The language of § 364(c)(1) is clear enough—a debtor's authority to obtain unsecured credit under that subsection is expressly premised on its inability to obtain credit under § 503(b)(1), i.e. as an allowable administrative expense under § 364(b). There is no other legislative requirement under the statute.

*Id.,* 427 B.R. at 858.  The Trustee could not obtain financing on an administrative basis. Therefore, the Loan is entitled to a "super-priority" basis.

**D.      The Debtor Requests That the DIP Lender Be Granted a Senior Lien on Property of the Debtor**

51.      Section 364(d) allows a postpetition lender to be granted a senior lien if (a) the debtor cannot obtain such credit otherwise and (b) there is adequate protection to the Prepetition Secured Lenders. 11 U.S.C. § 364(d).

52.      As set forth in the Wu Declaration, the Debtor has been unable to obtain credit that did not require a senior lien. Therefore, the first element is met.

53.     Second, the Prepetition Secured Lenders are adequately protected by an equity cushion that is conservatively estimated at more than twenty percent (20%).[2] The value of the Debtor's real property is conservatively estimated at $84.1 million.[3] After calculating the amount of the secured loans held by Crestline, Steiner and Melting Point, the equity cushion is approximately $20 million. This number is realized even after assuming – solely for analytical purposes – that the default rate of interest is accruing on the debt owed to Crestline pursuant to the Exit Financing Agreement.

54.     Furthermore, Crestline and Steiner will receive the indubitable equivalent of their interests in the Debtor's real property by the payment of interest payments to Crestline and Steiner, as set forth in the Budget, Schedule 1.3 to the DIP Credit Agreement attached hereto as **Exhibit B**. A copy of the Budget is also attached hereto as **Exhibit C**.

**E.     The Automatic Stay Should Be Modified on a Limited Basis.**

55.     The proposed Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to provide that, following the occurrence of an Event of Default, the automatic stay shall be vacated and modified to the extent necessary to permit the DIP Agent to exercise all rights and remedies in accordance with the DIP Loan Documents, or applicable law following a twenty-one (21) day notice period, during which time the Debtor or statutory committee (if appointed) may seek object.

56.     Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements, and, in the Debtor's business judgment, are reasonable and fair under the circumstances of this chapter 11 case. *See, e.g.*, *In re Southcross Holdings LP*, No.

---

[2] *See* Wu Declaration, Exh. C, Equity Cushion Analysis.

[3] See Dore Declaration.

16-20111 (Bankr. S.D. Tex. Apr. 11, 2016) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Autoseis, Inc.*, No. 14-20130 (Bankr. S.D. Tex. Mar. 27, 2014) (same); *In re ATP Oil and Gas Corp.*, No. 12-36187 (Bankr. S.D. Tex. Aug. 17, 2012) (same); *In re MPF Holdings US LLC*, No. 08-36084 (Bankr. S.D. Tex. Feb. 18, 2009) (same); *see also In re Magnum Hunter Res. Corp.*, No. 15-12533 (Bankr. D. Del. Dec. 15, 2015) (terminating automatic stay after event of default); *In re Peak Broad., LLC*, No. 12-10183 (Bankr. D. Del. Feb. 2, 2012) (terminating automatic stay after occurrence of termination event); *In re TMP Directional Mktg., LLC,* No. 11-13835 (Bankr. D. Del. Jan. 17, 2012) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Broadway 401 LLC*, No. 10-10070 (KJC) (Bankr. D. Del. Feb. 16, 2010) (same); *In re Haights Cross Commc'ns, Inc.*, No. 10-10062 (BLS) (Bankr. D. Del. Feb. 8, 2010) (same).

**F.      The DIP Loan Is an Exercise of Sound Business Judgment**

57.      In approving post-petition super-priority financing, courts look to whether the post-petition financing is a sound and reasonable business decision. *See, e.g., In re N. Bay Gen. Hosp., Inc.,* Case No. 08-20368 (Bankr. S.D. Tex. July 11, 2008); *see also In re L.A. Dodgers LLC,* 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

58.     Specifically, to determine whether the business judgment standard is met, a court need only examine whether a reasonable businessperson would make a similar decision under similar circumstances. *See In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

59.     Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).  The Court may also appropriately take into consideration non-economic benefits to the Debtor offered by a proposed postpetition facility.  For example, in *In re ION Media Networks. Inc.*, the bankruptcy court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. *Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization*. This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan. That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (emphasis added).

60.     The Debtor's determination to move forward with the DIP Facility is an exercise of its sound business judgment following an arm's-length process and careful evaluation of

alternatives. Specifically, the Debtor and its advisors have determined that the postpetition financing coupled with the protection of the automatic stay will allow the Debtor to realize the significant equity that the Property holds. Accordingly, the Court should authorize the Debtor's entry into the DIP Loan Documents, as it is a reasonable exercise of the Debtor's business judgment.

### G. Failure to Obtain Immediate Interim Access to the DIP Facility and Cash Collateral Would Cause Immediate and Irreparable Harm.

61. Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion. Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

62. For the reasons noted above, the Debtor has an immediate postpetition need to use advances under the DIP Facility. The Debtor cannot maintain the value of its estate during the pendency of the chapter 11 case without access to this liquidity. As set forth above, Crestline swept the Debtor's accounts of $2 million leaving the Debtor with *de minimis* funds. In short, the Debtor's ability to administer the chapter 11 case through the use of DIP Loan proceeds is vital to preserve and maximize the value of the Debtor's estates.

63. The Debtor requests that the Court hold and conduct a hearing to consider entry of the Interim Order authorizing the Debtor, from and after entry of the Interim Order until the Final Hearing, to receive initial funding under the DIP Facility. This relief will enable the Debtor to preserve and maximize value and, therefore, avoid immediate and irreparable harm

and prejudice to their estates and all parties in interest, pending the Final Hearing.  The Debtor also intends to continue to evaluate DIP alternatives.

### **Request for Final Hearing**

64.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtor requests that the Court set a date for the Final Hearing within approximately 30 days after the Petition Date and fix the time and date prior to the Final Hearing for parties to file objections to this motion.

### **Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

65.     To implement the foregoing successfully, the Debtor requests that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtor has established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

### **Notice**

66.     The Debtor will provide notice of this motion to: (a) the Office of the U.S. Trustee for the Western District of Texas; (b) holders of the 20 largest unsecured claims against the Debtor (on a consolidated basis); (c) counsel to the DIP Agent and the Prepetition Agent; (d) the United States Attorney's Office for the Western District of Texas; (g) the Internal Revenue Service; (h) the United States Securities and Exchange Commission; (i) the state attorneys general for all states in which the Debtor conducts business; and (j) any party that requests service pursuant to Bankruptcy Rule 2002.  The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

### **No Prior Request**

67.     No prior request for the relief sought in this motion has been made to this or any other court.

WHEREFORE, the Debtor respectfully requests that the Court enter the DIP Orders, granting relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Dated: January 7, 2020
       San Antonio, Texas

/s/ Eric Terry
Eric Terry (TX Bar No. 00794729)
**ERIC TERRY LAW, PLLC**
3511 Broadway Street
San Antonio, Texas 78029
Telephone:    (210) 468-8274
Facsimile:    (210) 319-5447

*Proposed Counsel to the Debtor and Debtor in Possession*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the above and foregoing document was served via the Court's ECF system on January 7, 2020 and via U.S. First Class Mail, postage paid, and/or by email on January 8, 2020 to the parties on the attached creditor matrix and to all parties that have requested ECF notification in this matter. Also, proposed counsel for debtor made best efforts to email all interested parties.

_/s/ Eric Terry_
Eric Terry