**SECURED SUPER-PRIORITY POST-PETITION CREDIT AGREEMENT**


dated as of January __, 2020


among


**XS RANCH FUND VI, L.P.**

as Debtor,



and

**SERENE INVESTMENT MANAGEMENT, LLC OR ITS AFFILIATES**

as Lender.

**ANNEXES**

ANNEX A DEFINITIONS
ANNEX B CLOSING CHECKLIST
ANNEX C REPORTING
ANNEX D NOTICE ADDRESSES

**SCHEDULES**

SCHEDULE 1.3 BUDGET
SCHEDULE 3.3 INSURANCE POLICIES
SCHEDULE 3.5 EXISTING SECURED INDEBTEDNESS

**EXHIBITS**

EXHIBIT A FORM OF PROPOSED FINANCING ORDER
EXHIBIT B FORM OF DEED OF TRUST AND ASSIGNMENT OF RENTS IN FAVOR OF LENDER

This SECURED SUPER-PRIORITY POST-PETITION CREDIT AGREEMENT (this "Agreement" or "Loan Agreement"), dated as of January __, 2020 among XS Ranch Fund VI, L.P. (the "Debtor" or "Borrower"), currently pending in the United States Bankruptcy Court for the Western District of Texas, Austin Division (the "Bankruptcy Court"), Case No. 20-10032 (the "Bankruptcy Case") and Serene Investment Management, LLC or its affiliates (together, the "Lender").

## RECITALS

WHEREAS, on January 6, 2020 (the "Petition Date"), the Debtor filed the Bankruptcy Case;.

WHEREAS, the Bankruptcy Court has not yet entered an Order. However, the Debtor has told the U.S. Trustee's Office that it has requested that the Lender provide a secured super-priority post-petition revolving credit facility in the amount of Five Million Dollars ($5,000,000);

WHEREAS, the Lender is willing to make available to the Debtor such post-petition loans upon the terms and subject to the conditions set forth herein;

WHEREAS, the Debtor has agreed to secure the obligations to the Lender hereunder with, *inter alia,* security interests in, and liens on, substantially all of the Debtor's property and assets, whether real or personal, tangible or intangible, now existing or hereafter acquired or arising (the "Collateral"), all as more fully provided herein; and

WHEREAS, capitalized terms used in this Agreement shall have the meanings ascribed to them herein and in Annex A. All annexes, schedules, exhibits and other attachments) hereto, or expressly identified to this Agreement, are incorporated herein by reference, and taken together with this Agreement, shall constitute but a single agreement.  These Recitals shall be construed as part of the Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual covenants hereinafter contained, and for other good and valuable consideration, the parties hereto agree as follows:

## 1. AMOUNT AND TERMS OF CREDIT

### 1.1    Credit Facility.

(i)    Revolving Credit Facility.

(a)    Subject to the terms and conditions hereof, the Lender agrees to make available to the Debtor upon entry of a final Financing Order, in substantially the form attached hereto as Exhibit A, the sum of Six Million Dollars ($6,000,000)(the "Loan Amount"), in one or more draws each in a minimum amount of Five Hundred Thousand Dollars ($500,000) upon not less than seven (7) days' prior written notice to Lender; provided that the first draw will be in the minimum amount of Seven Hundred Fifty Thousand Dollars ($750,000); and provided further that the aggregate disbursements under this Agreement shall not exceed $6,000,000 (each

3

such advance individually and collectively, the "<u>Loan</u>," as further defined in <u>Annex A</u> hereof), unless otherwise agreed to between the Debtor  and the Lender and subject to Bankruptcy Court approval in the Bankruptcy Case  Lender also agrees that upon entry of any interim financing order (in a form acceptable to Lender), to make available to the Debtor such sums as approved by the Bankruptcy Court in any such interim Financing Order.

(b) The entire unpaid disbursed balance of the Loan and all accrued and unpaid interest, fees, and any other non-contingent obligations shall be immediately due and payable in full in immediately available funds on the Maturity Date, which is defined in section 6.1 hereof.

1.2    <u>Prepayments</u>.

(i)    <u>Voluntary Repayment.</u>  The Debtor may at any time without premium or penalty repay the Loan.

(ii)    <u>Mandatory Prepayments.</u>  Immediately upon receipt by the Debtor of any insurance or condemnation proceeds or cash proceeds of any asset disposition, the Debtor  shall prepay the Loan in an amount equal to the proceeds received by Debtor, to be applied to the Loan.

(iii)    <u>Application of Certain Mandatory Prepayments</u>.  Any prepayments made by the Debtor shall be applied as follows: <u>first</u>, to any fees and reimbursable expenses of Lender then due and payable pursuant to any of the Loan Documents; <u>second</u>, to interest then due and payable on the Loan; and <u>third</u>, to the principal balance of Loan outstanding until the same has been paid in full.

1.3    <u>Use of Proceeds</u>.  The Debtor will not directly or indirectly use the proceeds of the Loan for any purpose other than those set forth in the <u>Schedule 1.3</u> (the "<u>Budget</u>") or to satisfy pre-bankruptcy real property taxes owing to local governmental authorities.

1.4    <u>Interest</u>.

(i)    The Debtor shall pay interest to Lender on the outstanding amount of the Loan, in arrears on the Maturity Date (defined in section 6  hereof), at nine and a half percent (9.5%) per annum.

(ii)    If any payment on any Loan becomes due and payable on a day other than a business day, the maturity thereof will be extended to the next succeeding business day and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension.

(iii)    All computations of interest shall be made by Lender on the basis of a 360-day year, in each case for the actual number of days occurring in the period for which such interest is payable.

(iv)    So long as an Event of Default (as defined in Section 7.1) has occurred and is continuing under Section 7.1 and at the election of Lender, confirmed by written notice from

Lender to the Debtor, the interest rates applicable to the Loan shall be increased by six and a half percentage points (6.5%) per annum above the rates of interest otherwise applicable hereunder (the "Default Rate"), and all outstanding obligations under the Loan shall bear interest at the Default Rate applicable to such outstanding obligations. Interest at the Default Rate shall accrue from the initial date of such Event of Default until that Event of Default is cured or waived and shall be payable upon demand.

        1.5     Application and Allocation of Payments.  Payments shall be applied to amounts then due and payable in the following order: (1) to fees and Lender's expenses reimbursable hereunder; (2) to interest on the Loan; (3) to principal payments; and (4) to all other obligations, including expenses of Lender to the extent reimbursable under Sections 9.3 and 9.4.

        1.6     Indemnity.  The Debtor  shall indemnify and hold harmless Lender and its affiliates, and each such Person's respective officers, directors, employees, attorneys, agents and representatives (each, an "Indemnified Person"), from and against any and all suits, actions, proceedings, claims, damages, losses, liabilities and expenses (including reasonable attorneys' fees and disbursements and other costs of investigation or defense, including those incurred upon any appeal) that may be instituted or asserted against or incurred by any such Indemnified Person as the result of credit having been extended under this Agreement and the other Loan Documents and the administration of such credit, and in connection with or arising out of the transactions contemplated hereunder and thereunder and any actions or failures to act in connection therewith, including any and all Environmental Liabilities, violations of state/local rules/statues (including habitability) and legal costs and expenses arising out of or incurred in connection with disputes between or among any parties to any of the Loan Documents; provided, that the Debtor  shall not be liable for any indemnification to an Indemnified Person to the extent that any such suit, action, proceeding, claim, damage, loss, liability or expense results from that  Indemnified Person's gross negligence or willful misconduct.  NO INDEMNIFIED PERSON SHALL BE RESPONSIBLE OR LIABLE TO ANY OTHER PARTY TO THIS AGREEMENT ANY SUCCESSOR, ASSIGNEE OR THIRD PARTY BENEFICIARY OF SUCH PERSON OR ANY OTHER PERSON ASSERTING CLAIMS DERIVATIVELY THROUGH SUCH PARTY, FOR INDIRECT, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES WHICH MAY BE ALLEGED AS A RESULT OF CREDIT HAVING BEEN EXTENDED UNDER ANY LOAN DOCUMENT OR AS A RESULT OF ANY OTHER TRANSACTION CONTEMPLATED HEREUNDER OR THEREUNDER.

## 2. CONDITIONS PRECEDENT

        2.1     Conditions to the Loan.  The Lender shall not be obligated to make any Loan, or to take, fulfill, or perform any other action hereunder, until the following conditions have been satisfied or provided for in a manner reasonably satisfactory to Lender, or waived in writing by Lender on or before the date of the initial Loan (such date, the "Closing Date"):

(i)     <u>Credit Agreement</u>.  This Agreement or counterparts hereof shall have been duly executed by, and delivered to all parties hereto; and Lender shall have received such other Loan Documents and instruments, contemplated by this Agreement including all those listed in the Closing Checklist attached hereto as <u>Annex B</u>, each in form and substance reasonably satisfactory to Lender; and the Deed of Trust and Assignment of Rents in favor of Lender shall have been recorded and the Security Agreements and Financing Statements in form satisfactory to Lender shall have been duly filed.

(ii)     <u>Orders</u>. The entry by the Bankruptcy Court of any interim or final Financing Order, substantially in the form attached hereto as **<u>Exhibit A</u>** (or any such Financing Order in a form acceptable to Lender), and, if such order is the subject of any pending appeal, no performance of any obligation of any party hereto shall have been stayed pending such appeal.

(iii)    the representations and warranties contained in Section 3 shall be true and correct in all material respects on and as of the date of Borrower's request for a Loan and on the effective date of each Loan as though made at and as of each such date.

(iv)    no default or Event of Default shall be continuing or would exist after giving effect to such Loan;

(v)    the Bankruptcy Case shall have not been dismissed or converted to a case under Chapter 7 of the Bankruptcy Code;

(vi)    no trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or examiner with enlarged powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed in the Bankruptcy Case; and

(vii)    for each Loan made after the final Financing Order has been entered by the Bankruptcy Court, the such final Financing Order shall be in full force and effect, shall not have been vacated or reversed, shall not have been modified or amended other than as acceptable to the Lender and shall not be subject to a stay.

## 3.   REPRESENTATIONS AND WARRANTIES

To induce Lender to make the Loan, the Debtor makes the following representations and warranties to Lender, each and all of which shall survive the execution and delivery of this Agreement.

3.1    <u>Authority and Ownership</u>.  The Debtor, subject to entry any interim or final Financing Order), has the requisite power and authority and the legal right to own, pledge, mortgage or otherwise bind the Debtor and encumber the property of the estate in the Bankruptcy Case pursuant to the terms of this Agreement and the Debtor owns the Collateral.

3.2    <u>Due Organization and Qualification</u>.  Borrower is a limited partnership duly existing under the laws of its state of organization and qualified and licensed

to do business in any state in which the conduct of its business or its ownership of property requires that it be so qualified.

3.3     Due Authorization; No Conflict.  Subject to the entry of the interim and final Financing Orders and the terms hereof, the execution, delivery, and performance of the Loan Documents are within Borrower's powers, have been duly authorized, and are not in conflict with nor constitute a breach of any provision contained in Borrower's certificate of limited partnership or limited partnership agreement, nor will they constitute an event of default under any material agreement to which Borrower is a party or by which Borrower is bound.  Borrower is not in default under any agreement to which it is a party or by which it is bound.

3.4     Name; Location of Chief Executive Office.  Borrower has not done business under any name other than that specified on the signature page hereof.  The chief executive office of Borrower is located at [_____].  All of Borrower's personal property and other assets are located only at the location set forth in this Section 3.4.

3.5     Environmental Condition.  None of Borrower's properties or assets has ever been used by Borrower or, to the best of Borrower's knowledge, by previous owners or operators, in the disposal of, or to produce, store, handle, treat, release, or transport, any hazardous waste or hazardous substance other than in accordance with applicable law; to the best of Borrower's knowledge, none of Borrower's properties or assets has ever been designated or identified in any manner pursuant to any environmental protection statute as a hazardous waste or hazardous substance disposal site, or a candidate for closure pursuant to any Environmental Laws; no lien arising under any Environmental Law has attached to any revenues or to any real or personal property owned by Borrower; and Borrower has not received a summons, citation, notice, or directive from any federal, state or other governmental agency concerning any action or omission by Borrower resulting in the releasing, or otherwise disposing of hazardous waste or hazardous substances into the environment.

3.6     Government Regulation.  The Debtor is not an "investment company" or an "affiliated person" of, or "promoter" or "principal underwriter" for, an "investment company," as such terms are defined in the Investment Company Act of 1940, or any other federal or state statute that restricts or limits its ability to incur Indebtedness or to perform its obligations hereunder.

3.7     Insurance.  Schedule 3.3 lists all insurance policies of any nature known to the Debtor for current occurrences by the Debtor.

3.8     Secured, Super Priority Obligations.

(i)     Subject to entry of  any interim or final Financing Order), and disbursements of loan proceeds pursuant to the Financing Order (or interim Financing Order), the provisions of the Loan Agreement and the Orders are effective to create in favor of the Lender, a legal, valid and perfected Lien on all assets of the Debtor senior to all existing encumbrances on such assets and a legal, valid and perfected security interest in all right, title and interest in the

Collateral senior to all existing encumbrances on the Collateral up to the amount disbursed by Lender. The amounts disbursed under any interim or final Financing Order are referred to herein collectively as the "Super-Priority Indebtedness."

(ii)     Subject to the Carve-Out, the Super-Priority Indebtedness shall have the status of an expense of administration under 11 U.S.C. §§ 503(b)(1) and 363(e), which shall have the priority of § 507(b), senior to all other expenses of administration under § 507(a)(1) and pursuant to 11 U.S.C. § 364(c)(1).

3.9     Prepetition Secured Indebtedness. To the best of the Debtor's knowledge, the prepetition secured indebtedness is listed accurately and fully on Schedule 3.9 attached hereto.

## 4. AFFIRMATIVE COVENANTS

The Debtor agrees that from and after the date hereof and until the Maturity Date (defined in section 6.1 hereof):

4.1     Payment of Charges.

(i)     Except as non-payment is permitted or payment is prohibited by the Bankruptcy Code or the Bankruptcy Court or subject to Section 4.1(ii),  the Debtor shall pay and discharge or cause to be paid and discharged promptly all Charges payable by the bankruptcy estate, including (i) Charges imposed upon it, its income and profits, or any of its property (real, personal or mixed) and all Charges with respect to tax, social security and unemployment withholding with respect to its employees, (ii) lawful claims for labor, materials, supplies and services or otherwise, and (iii) all storage or rental charges payable to warehousemen or bailees, in each case, before any thereof shall become past due, except in the case of clauses (ii) and (iii) where the failure to pay or discharge such Charges would not result in a material breach of this Agreement, as determined in good faith by the Lender.

(ii)     The Debtor  may in good faith contest, by appropriate proceedings, the validity or amount of any Charges, taxes or claims described in Section 4.1(i); provided, that (i) adequate reserves with respect to such contest are maintained on its books; (ii) no Lien shall be imposed to secure payment of such Charges (other than payments to warehousemen and/or bailees) that is superior to any of the Liens securing the Loans and such contest is maintained and prosecuted continuously and with diligence and operates to suspend collection or enforcement of such Charges; (iii) none of the Collateral becomes subject to forfeiture or loss as a result of such contest; and (iv) it shall promptly pay or discharge such contested Charges, taxes or claims and all additional charges, interest, penalties and expenses, if any, and shall deliver to Lender evidence reasonably acceptable to Lender of such compliance, payment or discharge, if such contest is terminated or discontinued adversely to the Debtor or the conditions set forth in this Section 4.1(ii) are no longer met and (v) Lender has not advised the Debtor  in writing that Lender reasonably believes that nonpayment or nondischarge thereof could have or result in a material breach in the Lender's good faith judgment.

4.2 <u>Books and Records</u>. The Debtor shall keep adequate books and records with respect to the Debtor's business activities in which proper entries, reflecting all financial transactions.

4.3 <u>Insurance.</u> The Debtor shall, at the sole cost and expense of the estate, maintain the policies of insurance described on <u>Schedule 3.3</u> as in effect on the date hereof or otherwise in form and amounts and with insurers reasonably acceptable to Lender. The Debtor shall deliver to Lender, in form and substance reasonably satisfactory to Lender, endorsements to (i) all "All Risk" and business interruption insurance and (ii) all general liability and other liability policies.

4.4 <u>Reporting</u>. The Debtor shall timely deliver to the Lender all items set forth on <u>Annex C</u>.

4.5 <u>Bankruptcy Court</u>. The Lender and the Lender's counsel shall receive all material pleadings, motions and other documents filed on behalf of the Debtor with the Bankruptcy Court.

4.6 <u>Further Assurances</u>. The Debtor, at the expense of the bankruptcy estate and upon the reasonable request of Lender, will duly execute and deliver, or cause to be duly executed and delivered, to Lender such further instruments and do and cause to be done such further acts as may be necessary or proper in the reasonable opinion of Lender to carry out more effectively the provisions and purposes of this Agreement.

## 5. NEGATIVE COVENANTS

The Debtor agrees that from and after the date hereof and until the Maturity Date (defined in section 6.1 hereof):

5.1 <u>Indebtedness</u>. The Debtor shall not create, incur, assume or permit to exist any Indebtedness (defined in Annex A), except (i) Indebtedness outstanding on the date of disbursement and described on <u>Schedule 3.5</u>, (ii) the Loan, and (iii) any Indebtedness that pays in full the Loan. The Debtor shall not, directly or indirectly, voluntarily purchase, redeem, defease or prepay any principal of, premium, if any, interest or other amount payable in respect of any Indebtedness prior to its scheduled maturity.

5.2 <u>Liens</u>. The Debtor shall not create, incur, assume or permit to exist any Lien (defined in <u>Annex A</u>) on or with respect to any property of the estate (whether now owned or hereafter acquired) except for (a) Permitted Encumbrances; (b) Liens in existence on the date hereof and summarized on <u>Schedule 3.5</u> securing the Indebtedness described on <u>Schedule 3.5</u>, extensions and renewals thereof, including extensions or renewals of any such Liens; provided that the principal amount of the Indebtedness so secured is not increased and the Lien does not attach to any other property; and (c) Liens arising from loans that pay off all Indebtedness outstanding under this Loan Agreement.

5.3 <u>Hazardous Materials</u>. The Debtor shall not cause or permit a release of any Hazardous Material on, at, in, under, above, to, from or about any of the real property

of the Debtor (the "<u>Real Property</u>") where such release would (a) violate in any respect, or form the basis for any Environmental Liabilities under, any Environmental Laws or Environmental Permits or (b) otherwise adversely impact the value or marketability of the Collateral, other than such violations or Environmental Liabilities that could not reasonably be expected to constitute a material breach of this agreement.

5.4　　<u>Chapter 11 Claims</u>. The Debtor shall not incur, create, assume, suffer to exist or permit any administrative expense, unsecured claim, or other super-priority claim or lien that is *pari passu* with or senior to the claims of the Lender against the bankruptcy estate, or apply to the Bankruptcy Court for authority to do so, except as expressly provided in this Agreement.

5.5　　<u>The Orders</u>. The Debtor shall not make or permit to be made any change, amendment or modification, or any application or motion for any change, amendment or modification, to any interim or final Financing Order without the prior written consent of the Lender.

5.6　　<u>Use of Proceeds</u>. The Borrower shall use the proceeds of the Loans in accordance with the Budget (subject to any Permitted Budget Variance, as defined below) and the interim and final Financing Orders entered in connection with the Bankruptcy Case exclusively for one or more of the following purposes (subject to any additional restrictions on the use of such proceeds set forth in the interim and final Financing Orders):

　　(i)　　to pay the fees owing to the Lender whether or not set forth in the Budget;

　　(ii)　　to the extent not included in Section 5.6(i), to pay certain costs, premiums, fees and expenses related to the Bankruptcy Case (including, without limitation, with respect to the Carve Out) in accordance with the Budget; and

　　(iii)　　to fund working capital and other needs of the Debtor in accordance with the Budget (subject to any Permitted Budget Variance) and any other uses permitted under Section 1.3 of this Agreement.

Proceeds of the Loans shall not be used (a) by the Debtor, or any other party-in-interest, including a Committee, or any of their representatives, to challenge or otherwise contest or institute any proceeding of any kind or nature to determine the validity, perfection, enforceability or priority of claims or security interests in favor of Lender, or to commence, prosecute or defend any claim, motion, proceeding or cause of action of any kind or nature against Lender and its agents, attorneys, advisors or representatives including, without limitation, any lender liability claims or subordination claims, to commence, prosecute or defend any claim or proceeding or cause of action of any kind or nature to disallow or challenge any Loan Document, or (d) to fund acquisitions, capital expenditures, capital leases, or any other similar expenditure other than capital expenditures specifically set forth in the Budget and approved by the Lender.

5.7     Budget Compliance and Variances.

(i)     The Borrower will use the proceeds of the Loans solely to make disbursements for expenditures provided for in accordance with Section 5.6 and this Section 5.7. The Borrower shall not pay any expenses (other than de minimis amounts) or other disbursements (other than de minimis disbursements) other than the type of expenses and disbursements set forth in the Budget.

(ii)    Beginning on the Petition Date, the Borrower shall not cause expenses to vary from the applicable Budget by more than ten percent (10%) in excess of the budgeted amount for cash disbursements on a trailing two (2) week basis (the "Permitted Budget Variances"), provided that to the extent the actual cash receipts in any such period exceed the amounts for such period in the applicable Budget, or if the cash disbursements in any such period are less than the amounts for such period in the applicable Budget, then the "Permitted Budget Variance" for such receipts or disbursements, as applicable, for the next succeeding period shall be increased by an amount equal to such difference (and shall continue to roll over into successive periods to the extent such additional budgeted capacity is unused by Borrower). In the event that actual amounts for total cash receipts and cash disbursements from operations line items and/or Professional Fees are in excess of the Budget, the parties hereto agree to negotiate in good faith to discuss any modification to the Budget and Permitted Budget Variances, it being understood and agreed that the Lender shall have no obligation to fund any amounts in excess of the Budget and Permitted Budget Variances, and it being further agreed that any amounts for Professional Fees in excess of the Budget shall not be paid by the Debtor until all amounts owing to the Lender hereunder are paid in full.

(iii)   If the Budget is updated, modified or supplemented by the Borrower, each such updated, modified or supplemented budget shall be approved in writing by, and shall be in form and substance satisfactory to, the Lender and no such updated, modified or supplemented budget shall be effective until so approved and once so approved shall be deemed to be a Budget. Each Budget delivered to Lender shall be accompanied by such supporting documentation as reasonably requested by the Lender. Each Budget shall be prepared in good faith based upon assumptions which the Borrower believes to be reasonable.

## 6. TERM

6.1     Maturity. Unless terminated sooner by reason of acceleration or otherwise, payment of the Loan shall be due upon the financing arrangements contemplated hereby shall be in effect until the earlier of (i) twelve months from the date of entry of the first interim or final Financing Order entered in the Bankruptcy Case, (ii) or such earlier date (the "Termination Date") upon which repayment is required due to the occurrence of an Event of Default (as defined below) (the "Maturity Date"). If there has been no Event of Default under the Loan at any time since loan commencement (including, without limitation, failure to pay any fees due under the Loan), then upon request made by Debtor to Lender not less than forty-five (45) days prior to the Maturity Date the Lender may, in Lender's sole discretion, extend the Maturity Date, for up to an additional twelve (12)

months subject to the execution of an amendment to this Agreement in form and substance satisfactory to Lender and Borrower, as well as any necessary approval of the Bankruptcy Court, which amendment may include increased to the interest rate and such other changes as may be requested by the Lender in its sole discretion.

      6.2    <u>Survival of Obligations</u>.  Except as otherwise expressly provided for in this Agreement, no termination or cancellation (regardless of cause or procedure) of any financing arrangement under this Agreement shall in any way affect or impair the obligations, duties and liabilities of the Debtor  or the rights of Lender relating to any unpaid portion of the Loan, due or not due, liquidated, contingent or unliquidated, or any transaction or event occurring prior to such termination, or any transaction or event, the performance of which is required after the Maturity Date.  Except as otherwise expressly provided herein, all undertakings, agreements, covenants, warranties and representations of or binding upon the Debtor , and all rights of Lender shall not terminate or expire, but rather shall survive any such termination or cancellation and shall continue in full force and effect until the Maturity Date and the repayment in full of the Loan; *provided, that* the provisions of Section 9, the payment obligations contained herein, and the indemnities contained in this Agreement shall survive the Maturity Date.

## 7.  EVENTS OF DEFAULT; RIGHTS AND REMEDIES

      7.1    <u>Events of Default</u>.  The occurrence of any one or more of the following events (regardless of the reason therefore) shall constitute an "<u>Event of Default</u>" hereunder:

      (i)    The Debtor fails to make any payment of principal of, or interest on, or fees owing in respect of the Loan when due and payable.

      (ii)    The Debtor fails or neglects to perform, keep or observe any of the provisions of <u>Sections 1.3 or 5</u>.

      (iii)    Any representation or warranty herein, in any other Loan Document, or in any written statement, report, financial statement or certificate made or delivered to Lender is untrue or incorrect in any material respect as of the date when made or deemed made.

      (iv)    The Loan Agreement, any other Loan Document, and any interim or final Financing Order shall, for any reason, cease to create a valid Lien on the Collateral purported to be covered thereby or such Lien shall cease to be a perfected Lien having the priority provided herein pursuant to Section 364 of the Bankruptcy Code or the Debtor shall so allege in any pleading filed in any court shall, for any reason, cease to be valid and binding.

      (v)    Failure on the part of the Debtor to observe or perform duly in any material respect any other covenants or agreements on the part of the Debtor in this Agreement or any other Loan Document that continue unremedied for a period of 30 days after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Debtor  by Lender (in accordance with Section 9.9 below); provided, however, that if the same is reasonably capable of being cured within 90 days, but cannot be reasonably cured within 30 days, the Debtor  may cure such event of default by commencing in good faith to cure the default

promptly after its receipt of such written notice and prosecuting the cure of such default to completion with diligence and continuity within a reasonable time thereafter, but in no event later than 90 days after its receipt of such written notice.

(vi)    A trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed in the Bankruptcy Case.

(vii)    Any material non-compliance by the Debtor with any of the terms or provisions of the Financing Order or any interim Financing Order, including, without limitation, failure to comply with the Budget;

(viii)    Entry of an order by the Bankruptcy Court converting the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code or dismissing the Bankruptcy Case.

(ix)    Application by the Debtor to the Bankruptcy Court or any other court of competent jurisdiction for an order authorizing the granting of any liens or claims senior to the Lender's Lien and the Super Priority Indebtedness.

(x)    Filing by the Debtor of any plan or reorganization other than one providing for payment in full of all obligations owing to the Lender on or prior to the Maturity Date.

(xi)    The Financing Orders are amended, stayed, vacated, or modified without the Lender's prior written consent.

(xii)    Filing of any challenge by the Debtor to the validity, priority, or extent of any Liens in favor of the Lender.

(xiii)    Any person holding a lien on the Collateral is granted relief from the automatic stay.

7.2    Remedies.

(i)    If any Event of Default has occurred and is continuing, Lender may increase the rate of interest applicable to the Loan to the Default Rate.

(ii)    Subject to the Bankruptcy Court's order, if any Event of Default has occurred and is continuing, Lender may: declare all or any portion of the Loan to be forthwith due and payable or exercise any rights and remedies provided to Lender under this Agreement or at law or equity, including all remedies provided under the Bankruptcy Code.

## 8. SUCCESSORS AND ASSIGNS

8.1    Successors and Assigns.  This Agreement shall be binding on and shall inure to the benefit of the Debtor and Lender and their respective successors and assigns (including, in the case of Debtor, the reorganized debtor), except as otherwise provided herein or therein.  The Debtor may not assign, transfer, hypothecate or otherwise convey its

rights, benefits, obligations or duties hereunder without the prior express written consent of Lender. Any such purported assignment, transfer, hypothecation or other conveyance by the Debtor without the prior express written consent of Lender shall be void. The terms and provisions of this Agreement are for the purpose of defining the relative rights and obligations of the Debtor and Lender with respect to the transactions contemplated hereby and no Person shall be a third party beneficiary of any of the terms and provisions of this Agreement.

## 9. MISCELLANEOUS

9.1 <u>Complete Agreement; Modification of Agreement</u>. This Agreement constitutes the complete agreement between the parties with respect to the subject matter thereof and may not be modified, altered or amended except as set forth in <u>Section 9.2</u>.

9.2 <u>Amendments and Waivers</u>. Except for actions expressly permitted to be taken by Lender no amendment, modification, termination or waiver of any provision of this Agreement, or any consent to any departure by Debtor therefrom, shall in any event be effective unless the same shall be in writing and signed by Lender and Debtor.

9.3 <u>Fees</u>.

(i) *Commitment Fee*. The Debtor shall pay the Lender a commitment fee of 3% of the Loan Amount, or $180,000.

(ii) *Funding Fee*. The Debtor shall pay the Lender a funding fee of one half (1/2) percent of all amounts drawn by the Debtor.

(iii) *Exit Fee.* The Debtor shall pay Lender an exit fee of 2% of the Loan Amount or $120,000 .

9.4 <u>Reimbursement of Lender Expenses</u>. The Debtor on behalf of the bankruptcy estate shall reimburse Lender for all reasonable fees, costs and expenses (including the reasonable fees and expenses of all of its counsel, advisors, consultants and auditors) incurred in connection with the review of Debtor's Collateral and the negotiation, and preparation of the Loan documents and such expenses for filing and/or recordation of documents related to the Loan (including the issuance of title insurance) and such other fees and expenses incurred in connection with:

(A) any amendment, modification or waiver of, consent with respect to, or termination of, the Loan Agreement;

(B) any litigation, contest, dispute, suit, proceeding or action (whether instituted by Lender, the Debtor or any other Person and whether as a party, witness or otherwise) in any way relating to the Collateral, or any other agreement to be executed or delivered in connection herewith or therewith, including any litigation, contest, dispute, suit, case, proceeding or action, and any appeal or review thereof, in connection with a case commenced by or against the

Debtor or Lender or any other Person that may be obligated to Lender by virtue of this Agreement; including any such litigation, contest, dispute, suit, proceeding or action arising in connection with any work-out or restructuring of the Loan during the pendency of one or more Events of Default;

(C)    any attempt to enforce any remedies of Lender under this Agreement, including any such attempt to enforce any such remedies in the course of any work-out or restructuring of the Loan during the pendency of one or more Events of Default;

(D)    efforts to (i) monitor the Loan or any of the other obligations, (ii) evaluate, observe or assess the Debtor or their respective affairs, and (iii) verify, protect, evaluate, assess, appraise, collect, sell, liquidate or otherwise dispose of any of the Collateral;

including, as to each of <u>clauses (A) through (D)</u> above, all reasonable attorneys' and other professional fees arising from such services and other advice, assistance or other representation, including those in connection with any appellate proceedings, and all expenses, costs, charges and other fees incurred by such counsel and others in connection with or relating to any of the events or actions described in this <u>Section 9.4.</u>

Lender shall provide documentation of such fees and expenses to Debtor, and the Debtor shall have ten (10) business days after receipt of said documentation to dispute the reasonableness or propriety of the claimed fees and expenses ("<u>Review Period</u>").  Any dispute between the Debtor and Lender concerning the reasonableness or propriety of the fees and costs will be determined by the Bankruptcy Court.  The Debtor shall reimburse Lender for its fees and costs promptly after expiration of the Review Period unless an objection is timely made.  If an objection is timely made, the Debtor shall reimburse Lender the amount determined by the Bankruptcy Court to be properly due to Lender under this paragraph.

(ii)    Lender shall pay costs of compensation required by any broker it retains to negotiate the Indebtedness.

9.5    <u>No Waiver</u>.

Lender's failure, at any time or times, to require strict performance by the Debtor of any provision of this Agreement shall not waive, affect or diminish any right of Lender thereafter to demand strict compliance and performance herewith or therewith.  Any suspension or waiver of an Event of Default shall not suspend, waive or affect any other Event of Default whether the same is prior or subsequent thereto and whether the same or of a different type. Subject to the provisions of <u>Section 9.2</u>, none of the undertakings, agreements, warranties, covenants and representations of Debtor contained in this Agreement and no Event of Default by the Debtor shall be deemed to have been suspended or waived by Lender, unless such waiver or suspension is by an instrument in writing signed by an officer of or other authorized employee of Lender and directed to the Debtor specifying such suspension or waiver.

9.6       <u>Remedies</u>.  Lender's rights and remedies under this Agreement shall be cumulative and nonexclusive of any other rights and remedies that Lender may have, by operation of law or otherwise.  Recourse to the Collateral shall not be required.

9.7       <u>Severability</u>.  Wherever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Agreement.

9.8       <u>Governing Law</u>.  Except as otherwise expressly provided in this agreement, in all respects, including all matters of construction, validity and performance, this agreement and the obligations shall be governed by, and construed and enforced in accordance with, the internal laws of the State of California applicable to contracts made and performed in that state and any applicable laws of the United States of America.  The Debtor and the Lender hereby consent and agree that the Bankruptcy Court shall have exclusive jurisdiction to hear and determine any claims or disputes pertaining to this agreement or to any matter arising out of or relating to this agreement.

9.9       <u>Notices</u>.  Except as otherwise provided herein, whenever it is provided herein that any notice, demand, request, consent, approval, declaration or other communication shall or may be given to or served upon any of the parties by any other parties, or whenever any of the parties desires to give or serve upon any other parties any communication with respect to this Agreement, each such notice, demand, request, consent, approval, declaration or other communication shall be in writing and shall be deemed to have been validly served, given or delivered: (a) upon the earlier of actual receipt and three (3) business days after deposit in the United States mail, registered or certified mail, return receipt requested, with proper postage prepaid; (b) upon transmission, when sent by telecopy or other similar facsimile transmission (with such telecopy or facsimile promptly confirmed by delivery of a copy by personal delivery or United States Mail as otherwise provided in this <u>Section 9.9</u>); (c) one (1) business day after deposit with a reputable overnight courier with all charges prepaid or (d) when delivered, if hand-delivered by messenger, all of which shall be addressed to the party to be notified and sent to the address or facsimile number indicated in <u>Annex D</u> or to such other address (or facsimile number) as may be substituted by notice given as herein provided.  The giving of any notice required hereunder may be waived in writing by the party entitled to receive such notice.  Failure or delay in delivering copies of any notice, demand, request, consent, approval, declaration or other communication to any Person (other than the Debtor or Lender) designated in <u>Annex D</u> to receive copies shall in no way adversely affect the effectiveness of such notice, demand, request, consent, approval, declaration or other communication.

9.10      <u>Section Titles</u>.  The Section titles contained in this Agreement are and shall be without substantive meaning or content of any kind whatsoever and are not a part of the agreement between the parties hereto.

9.11      <u>Counterparts</u>.  This Agreement may be executed in any number of separate counterparts, each of which shall collectively and separately constitute one agreement.

9.12    <u>Reinstatement</u>. This Agreement shall continue to be effective or to be reinstated, as the case may be, if at any time payment and performance of the Loan, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the Loan, whether as a "voidable preference," "fraudulent conveyance," or otherwise, all as though such payment or performance had not been made. In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the Loan shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

9.13    <u>Advice of Counsel</u>. Each of the parties represents to each other party hereto that it has been represented by counsel of its choosing in connection with the preparation and negotiation of this Agreement.

9.14    <u>No Strict Construction</u>. The parties hereto have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

9.15    <u>Savings Clause</u>. Notwithstanding any other provision herein, the aggregate interest rate charged with respect to any of the Loans, including all charges or fees in connection therewith deemed in the nature of interest under applicable law shall not exceed the Highest Lawful Rate. If the rate of interest (determined without regard to the preceding sentence) under this Agreement at any time exceeds the Highest Lawful Rate, the outstanding amount of the Loans made hereunder shall bear interest at the Highest Lawful Rate until the total amount of interest due hereunder equals the amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect. In addition, if when the Loans made hereunder are repaid in full the total interest due hereunder (taking into account the increase provided for above) is less than the total amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect, then to the extent permitted by law, Borrower shall pay to Lender an amount equal to the difference between the amount of interest paid and the amount of interest which would have been paid if the Highest Lawful Rate had at all times been in effect. Notwithstanding the foregoing, it is the intention of Lender and Borrower to conform strictly to any applicable usury laws. Accordingly, if Lender contracts for, charges, or receives any consideration which constitutes interest in excess of the Highest Lawful Rate, then any such excess shall be cancelled automatically and, if previously paid, shall at Lender's option be applied to the outstanding amount of the Advances made hereunder or be refunded to Borrower.

**[Remainder of page intentionally left blank.]**

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first written above.

**BORROWER:**

**XS RANCH FUND VI, L.P. a Delaware limited partnership**

By: XS RANCH FUND VI MANAGER, L.P. a Delaware limited partnership, its General Partner

By: COAST RANGE INVESTMENTS, LLC, a Delaware limited liability company, its General Partner

By: _____

Name: James P. Foster, Manager
C

**LENDER:**

Serene Investment Management, LLC

By: _____
Name: Adam Phillips
Title: Its Managing Member

**DEFINITIONS**

Capitalized terms used in this Loan Agreement shall have (unless otherwise provided elsewhere in the Loan Documents) the following respective meanings, and all references to Sections, Exhibits, Schedules or Annexes in the following definitions shall refer to Sections, Exhibits, Schedules or Annexes of or to the Agreement:

"Avoidance Actions" means any and all claims arising under section 549 of the Bankruptcy Code.

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"Carve-Out" means: (i) all fees required to be paid to the clerk of the Bankruptcy Court, any agent thereof and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate; (ii) fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an amount not to exceed $50,000; (iii) to the extent allowed by the Bankruptcy Court, all claims for unpaid fees, costs and expenses (the "Professional Fees") incurred by persons or firms retained by the Borrower or any official committee that may be appointed in the Bankruptcy Case whose retention is approved by the Bankruptcy Court pursuant to sections 327, 328 and 1103 of the Bankruptcy Code (collectively, the "Professional Persons") that are: (A) based upon services rendered at any time prior to the occurrence of an Event of Default unless such Event of Default is waived or cured as provided in this Agreement, or (B) after the occurrence and during the continuation of an Event of Default, if any, in an aggregate amount not to exceed $875,000. As long as no Event of Default shall have occurred and be continuing, the Borrower shall be permitted to pay all fees, expenses, compensation and reimbursement of expenses allowed and payable, including under any order entered in the Cases establishing procedures for interim monthly compensation and reimbursement of Professional Fees, or sections 330 and 331 of the Bankruptcy Code, as the same may be due and payable, and the same shall not reduce the Carve-Out. In the event the Carve-Out is reduced by any amount during an Event of Default, upon the effectiveness of a cure of such Event of Default, the Carve Out shall be increased by such amount. Nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described in clauses (i), (ii) or (iii) above, on any grounds.

"Charges" means all federal, state, county, city, municipal, local, foreign or other governmental taxes, levies, assessments, charges, liens, claims or encumbrances upon or relating to (a) the Collateral or (b) the obligations.

"Closing Checklist" means the schedule, including all appendices, exhibits or schedules thereto, listing certain documents and information to be delivered in connection with the Agreement, the other Loan Documents and the transactions contemplated thereunder, substantially in the form attached hereto as Annex B.

"Collateral" means all property of this bankruptcy estate, real or personal, tangible or intangible, and Avoidance Actions now existing or hereafter acquired, and all proceeds therefrom; provided, however, that claims arising under sections 544, 545, 547, 548 of the Bankruptcy Code and under similar state laws are excepted from the Lender's Collateral and do not secure the Loan.

"Committee" means an official committee of unsecured creditors or equity committee appointed in the Bankruptcy Case by the U.S. Trustee.

"Environmental Laws" means all applicable federal, state, local and foreign laws, statutes, ordinances, codes, rules, standards and regulations, now or hereafter in effect, and any applicable judicial or administrative interpretation thereof, including any applicable judicial or administrative order, consent decree, order or judgment, imposing liability or standards of conduct for or relating to the regulation and protection of human health, safety, the environment and natural resources (including ambient air, surface water, groundwater, wetlands, land surface or subsurface strata, wildlife, aquatic species and vegetation). Environmental Laws include the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. §§ 9601 et seq.) ("CERCLA"); the Hazardous Materials Transportation Authorization Act of 1994 (49 U.S.C. §§ 5101 et seq.); the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. §§ 136 et seq.); the Solid Waste Disposal Act (42 U.S.C. §§ 6901 et seq.); the Toxic Substance Control Act (15 U.S.C. §§ 2601 et seq.); the Clean Air Act (42 U.S.C. §§ 7401 et seq.); the Federal Water Pollution Control Act (33 U.S.C. §§ 1251 et seq.); the Occupational Safety and Health Act (29 U.S.C. §§ 651 et seq.); and the Safe Drinking Water Act (42 U.S.C. §§ 300(f) et seq.), and any and all regulations promulgated thereunder, and all analogous state, local and foreign counterparts or equivalents and any transfer of ownership notification or approval statutes.

"Environmental Liabilities" means, with respect to any Person, all liabilities, obligations, responsibilities, response, remedial and removal costs, investigation and feasibility study costs, capital costs, operation and maintenance costs, losses, damages, punitive damages, property damages, natural resource damages, consequential damages, treble damages, costs and expenses (including all reasonable fees, disbursements and expenses of counsel, experts and consultants), fines, penalties, sanctions and interest incurred as a result of or related to any claim, suit, action, investigation, proceeding or demand by any Person, whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute or common law, including any arising under or related to any Environmental Laws, Environmental Permits, or in connection with any Release or threatened Release or presence of a Hazardous Material whether on, at, in, under, from or about or in the vicinity of any real or personal property.

"Environmental Permits" means all permits, licenses, authorizations, certificates, approvals or registrations required by any governmental authority under any Environmental Laws.

"Financing Order" means an interim or final order of the Bankruptcy Court (as the same may be amended, supplemented, or modified from time to time after entry thereof in accordance with the terms thereof) in the form set forth as Exhibit A hereto, with changes to such form as are satisfactory to the Lender in the Lender's sole discretion, approving the Loan Documents and authorizing the initial Loans.

"Hazardous Material" means any substance, material or waste that is regulated by, or forms the basis of liability now or hereafter under, any Environmental Laws, including any material or substance that is (a) defined as a "solid waste," "hazardous waste," "hazardous material," "hazardous substance," "extremely hazardous waste," "restricted hazardous waste," "pollutant," "contaminant," "hazardous constituent," "special waste," "toxic substance" or other similar term or phrase under any Environmental Laws, or (b) petroleum or any fraction or by-product thereof, asbestos, polychlorinated biphenyls (PCB's), or any radioactive substance.

"Highest Lawful Rate" means the maximum lawful interest rate, if any, that at any time or from time to time may be contracted for, charged, or received under the laws applicable to Lender which are presently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum non-usurious interest rate than applicable laws now allow.

"Indebtedness" means, with respect to any Person, without duplication, (a) all indebtedness of such Person for borrowed money or for the deferred purchase price of property and (b) all Indebtedness referred to above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon or in property or other assets (including accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness, and (i) the obligations.

"Lien" means any mortgage or deed of trust, pledge, hypothecation, assignment, deposit arrangement, lien, charge, claim, security interest, easement or encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any lease or title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the Code, as defined herein in Annex A or comparable law of any jurisdiction)

"Loan" means all loans, advances, debts, liabilities and obligations for the performance of covenants, tasks or duties or for payment of monetary amounts (whether or not such performance is then required or contingent, or such amounts are liquidated or determinable) owing by the Debtor to Lender, and all covenants and duties regarding such amounts, of any kind or nature, present or future, whether or not evidenced by any note, agreement, or other instrument, arising under the Agreement.

"Loan Documents" means, collectively, this Agreement, the Deed of Trust and Assignment of Rents by Borrower in favor of Lender, and all other documents set forth on the

Closing Checklist, along with and any other agreement entered into in connection with this Agreement, all as amended or extended from time to time.

"<u>Permitted Encumbrances</u>" means the following encumbrances: (a) Liens for taxes or assessments or other governmental Charges not yet due and payable or which are being contested in accordance with <u>Section 4.2(b)</u>; (b) pledges or deposits of money securing statutory obligations under workmen's compensation, unemployment insurance, social security or public liability laws or similar legislation; (c) pledges or deposits of money securing bids, tenders, contracts (other than contracts for the payment of money) or leases to which Debtor is a party as lessee made in the ordinary course of business; (d) inchoate and unperfected workers', mechanics' or similar liens arising in the ordinary course of business; (e) deposits securing, or in lieu of, surety, appeal or customs bonds in proceedings to which Debtor is a party; (f) zoning restrictions, easements, licenses, or other restrictions on the use of the Real Property or other minor irregularities in title (including leasehold title) thereto, so long as the same do not materially impair the use, value, or marketability of such Real Property; (g) presently existing or hereafter created Liens in favor of Lender; and (h) subject to entry of the Orders, presently existing or hereafter created Liens in favor of the prepetition lender, which Liens are subordinate to the Liens in favor of the Lender.

"<u>Person</u>" means any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, public benefit corporation, other entity or government (whether federal, state, county, city, municipal, local, foreign, or otherwise, including any instrumentality, division, agency, body or department thereof).

Wherever from the context it appears appropriate, each term stated in either the singular or plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter genders. The words "including", "includes" and "include" shall be deemed to be followed by the words "without limitation"; the word "or" is not exclusive; references to Persons include their respective successors and assigns (to the extent and only to the extent permitted by the Agreement) or, in the case of governmental Persons, Persons succeeding to the relevant functions of such Persons; and all references to statutes and related regulations shall include any amendments of the same and any successor statutes and regulations. Whenever any provision in the Agreement refers to the knowledge (or an analogous phrase) of the Debtor , such words are intended to signify that he or it has actual knowledge or awareness of a particular fact or circumstance or, if it had exercised reasonable diligence, would have known or been aware of such fact or circumstance.

**ANNEX B**
**to**
**CREDIT AGREEMENT**

**CLOSING CHECKLIST**.

In addition to, and not in limitation of, the conditions described in <u>Section 2.1</u> of the Agreement, the following items must be received by Lender in form and substance satisfactory to Lender on or prior to the Closing Date (each capitalized term used but not otherwise defined herein shall have the meaning ascribed thereto in <u>Annex A</u> to the Agreement), unless such requirement is waived in writing by the Lender:

      A.    <u>Appendices</u>.  All Appendices to the Agreement, in form and substance satisfactory to Agent. .

      B.    <u>Insurance</u>.  Satisfactory evidence that the insurance policies required by <u>Section 4.3</u> are in full force and effect and delivery of such endorsements described therein.

      C.    <u>Title Insurance</u>. At the expense of the Debtor, an ALTA loan title insurance policy issued by [TITLE COMPANY] to the Lender, having a liability in the amount of the Loan, and insuring, as of the time and date that the Deed of Trust is recorded that fee title to the Real Estate is vested in the Debtor and that the lien of the Deed of Trust is a valid first priority Lien on the Real Estate, subject only to those Liens and exceptions as permitted herein and the Bankruptcy Court Order and containing such endorsements as Lender shall reasonably require.

      D.    <u>Authority</u>. The Order of the Bankruptcy Court and of the U.S. Trustee's duly appointing assigned Case No. 20-10032.

**ANNEX C**

**to**
**CREDIT AGREEMENT**

**REPORTING**

The Debtor shall deliver or cause to be delivered to Lender, as indicated, the following:

(a)    <u>Default Notices</u>.  To Lender, as soon as practicable, and in any event within five (5) Business Days after the Debtor has actual knowledge of the existence of any Default, Event of Default or other event that has had a Material Adverse Effect, telephonic or telecopied notice specifying the nature of such Default or Event of Default or other event, including the anticipated effect thereof, which notice, if given telephonically, shall be promptly confirmed in writing on the next Business Day.

(b)    <u>Insurance Notices</u>.  To Lender, disclosure of losses or casualties received by the Debtor from the Debtor's insurers.

(c)    <u>Financial Information</u>.  To Lender, on a bi-weekly basis, a report of any variances to the Budget and, no later than the fifth business day after the end of each calendar month, a present roll-forward of the 13 week cashflow.

(d)    <u>Other Documents</u>.  To Lender, such other financial and other information respecting Debtor's business or financial condition as Lender shall from time to time reasonably request.

.

**ANNEX D**
**CREDIT AGREEMENT**

**NOTICE ADDRESSES**

If to Lender:
      Serene Investment Management, LLC
      c/o 366 Development, LLC
      Attn: Adam Phillips
      2148 Jimmy Durante Blvd, Suite B
      Del Mar, CA 92014
      (Tel.) 619-955-5777
      Email: adam.phillips@366development.com

With copy to:
      Randy Michelson
      Michelson Law Group
      220 Montgomery Street, Suite 2100
      San Francisco, CA 94104
      (Tel.)  415-512-8600
      Email:  randy.michelson@michelsonlawgroup.com

If to Debtor:
      XS RANCH FUND VI, L.P.
      c/o Teneo Capital LLC
      Attn: Christopher Wu
      280 Park Avenue, 4th Floor
      New York, NY  10017
      (Tel.) 646-561-3541
      Email: chris.wu@teneo.com

With copy to:
      Pamela M. Egan
      Potomac Law Group, PLLC
      1905 7th Ave. W
      Seattle, WA 98119
      (Tel.) 415 297-0132
      Email: pegan@potomaclaw.com

**Schedule 1.3**
**to**
**<u>CREDIT AGREEMENT</u>**


**<u>BUDGET</u>**



**[omitted from service copy, see Exh. C to Motion]**

**Schedule 3.3**
**to**
**CREDIT AGREEMENT**

**INSURANCE POLICIES**

| Type of Coverage | Carrier | Policy No. | Exp. Date |
|---|---|---|---|
|  |  |  |  |
| General Liability |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

**Schedule 3.5**
**to**
**<u>CREDIT AGREEMENT</u>**

**<u>EXISTING SECURED INDEBTEDNESS</u>**

| Lienholder | Indebtedness (approx. as of 1.6.20) |
|---|---|
| | |
| Crestline Direct Finance, L.P. | $44,681,952 (amount disputed) |
| Steiner & Sons, Ltd. | $11,500,000.00 |
| Melting Point Solutions, Inc. | $324,717.82 |

**EXHIBIT A**
**to**
**CREDIT AGREEMENT**

**FINANCING ORDER**

**[omitted from service copy, see Exh. A to Motion]**

**EXHIBIT B**
**to**
**CREDIT AGREEMENT**

**DEED OF TRUST**

**[TO BE DISCUSSED]**

**EXHIBIT A**
**LEGAL DESCRIPTION OF PROPERTY**

THE LAND DESCRIBED HEREIN IS SITUATED IN THE STATE OF TEXAS, COUNTY OF BASTROP, CITY OF BASTROP, AND IS DESCRIBED AS FOLLOWS:

[TO BE INCLUDED]